# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 4:18−cr−00714** |
| | § | |
| **TRAVIS DEMOIS WILSON** | § | |

## DEFENDANT TRAVIS DEMOIS WILSON'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE, STATEMENTS AND MEMORANDUM IN SUPPORT THEREOF AND REQUEST FOR EVIDENTIARY HEARING

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES **TRAVIS DEMOIS WILSON**, "**WILSON**," Defendant herein, and files this his Supplement to his Motion to Suppress Evidence, Dkt. No.60, and in Response to the Government's Opposition to **WILSON's** Motion to Suppress Evidence and Statements and Memorandum in Support Thereof, (Dkt. No. 62), and would say unto the Court the following:

## I.    ISSUES

**ISSUES:** (1) The initial stop of the vehicle in which **WILSON** was a passenger violated his right to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution, because it was not supported by a reasonable suspicion that the driver of the vehicle had committed a traffic violation. (2) Secondly. even if the initial stop was valid, the scope of the detention exceeded the purpose of the initial stop and violated the Fourth Amendment because it was not

1

supported by a reasonable suspicion to believe that **WILSON** or the driver were involved in illegal drug smuggling.

## II.    SUMMARY

Defendant passenger **WILSON** has the right and standing to bring a motion to suppress in his own right. *Brendlin v. California*, 551 U.S. 249, 256-57 (2007). The passenger is entitled to challenge the constitutionality of a traffic stop. *Brendlin* at 256-57. In *Brendlin* the United States Supreme Court ruled that the passenger of a vehicle has standing to contest the legality of the traffic stop that results in his own detention. *Brendlin*, 551 at 249-51.

**WILSON** argues that: (1) the initial stop was unlawful from its inception because it was not supported by a reasonable suspicion that the driver of the vehicle in which he was a passenger had committed a traffic violation, and thus the initial stop was a seizure that violated the Fourth Amendment from its inception; (2) even if the initial stop was valid, the scope of the detention exceeded the purpose of the initial stop and violated the Fourth Amendment because it was not supported by a reasonable suspicion to believe that **WILSON** or the driver were involved in illegal drug smuggling; (3) therefore, all evidence resulting from the search of the vehicle, including post-arrest statements made by **WILSON** are products of the Fourth Amendment violation and "fruits of the poisonous tree" and must be suppressed pursuant to the exclusionary rule.

2

Under the Fourth Amendment, warrantless searches are presumptively unreasonable, and the Government has the burden of proving by a preponderance of the evidence the existence of circumstances that justify a warrantless search. *United States v. Wallen*, 388 F. 3rd 161, 164 (5th Cir. 2004).

### III.   FACTS

**WILSON** adopts the car cam video tape that the Government has tendered to the Court for the limited purpose of the Motion to Suppress, and presents this, **WILSON's** interpretation of the tape, for the limited purpose of that Motion, and says:

- (00:24)[1]: Before car goes into intersection. Brake lights come on. Within the same second, the turn lights come on. The car's back tires are still on the white line in front of the intersection. You can see a maroon car (two cars in front of defendant) turning left without blinker, also crossing the dotted white line;

- (00:25): Dark blue/black truck turning left without blinker (one car length in front of Defendant). The truck is also crossing the dotted white line while turning left.

---

[1] (00:00) indicates running time on the car cam video as placed by the Government on the secure internet discovery site. The vehicle is stopped at (00:00) until (00:24).

- (00:26-27): Defendant's vehicle is crossing the recommended left turn angle of the dotted white line while turning left;

- (00:31): the cop car lights are activated;

- (00:46): Defendant's vehicle turns right into the parking center, while using a right turn blinker;

- (00:53): Defendant's vehicle stops in front of the Burger King;

- (00:55-57): Police car blips its siren at the Defendant's vehicle and then the Defendant's vehicle turns on a left turn signal to indicate to the cop that it is pulling into a safer area of the parking lot. The place they had been previously was the major through lane for the parking lot which consisted of a large shopping center with numerous buildings;

- (01:11): Defendant's vehicle comes to a complete stop;

- (01:19): See the first officer (#1)[1] approach the car. Defendant's vehicle's driver side door opens before the officer gets there;

- (01:19-23): Defendant's driver attempts to get out of the car but is told (we believe) to stop getting out and put her arms on the steering wheel;

- (01:46): Second officer (#2)[2] approaches from the right;

- (01:48-49): Officer #2 approaches passenger car door.

4

- (01:58): Both officers appear to be conversing with the people within the vehicle. Officer #1 on driver's side and Officer #2 with the passenger side;

- (02:35): The driver's set of keys are taken and placed on top of the Defendant's vehicle's roof (which, if it is the driver's keys to the vehicle, would indicate that the driver/passenger were officially detained at that time as they could not leave);

- (02:42): Driver is asked by Officer #1 if there is anything illegal in the car;

- (02:57): Driver is asked to step out of the vehicle.

- (03:15): Driver is taken to the back of the vehicle.

- (03:24): Passenger told to place his hands on top of the car. Officer #1 has come over to the passenger side of the vehicle;

- (03:31): Defendant is handcuffed;

- (03:34): Officer #3[3] appears on right side of the dash cam;

- (03:51): Defendant is taken off camera by Officer #2; Officer #3 begins to handcuff the driver;

- (03:57-04:00): Officer #1 asks the driver 'Any drugs in the car?' and then states 'Honesty is the best policy';

- (04:15): Officer tells one of the people 'You have the right to remain silent, right now.' No further Miranda warning was given, and none were given to **WILSON**.

- (04:36): Officer #1 leaves the dash cam on the left and Officer #3 escorts the driver off the right side of the dash cam;

- (05:13): Police dog, on leash, appears on right side of the dash cam;

- (05:16): It appears that the police dog is being led by Officer #1. The police dog circles from the driver side of the vehicle to the front hood of the vehicle;

- (05:21-22): the Police dog, jumps up to the driver side window;

- (05:38-40): the police dog scrambles around the rear of the vehicle;

- (05:46): it appears the police dog jumps in the front passenger window;

- (06:03): the police dog jumps back in the open window of the front passenger side of the vehicle;

- (06:20-22): the police dog and Officer #1 exit the dash cam video on the left;

- (06:34): Officer #1 appears back in front of the dash cam, entering on the left;

- (06:38): Officer #1 approaches the vehicle on the front passenger side and opens the door;

- (06:41): Officer #2 appears on the dash cam on the right side of the video;

- (06:42): Officer #1 reaches into the front passenger side seat;

- (07:10): Officer #3 appears on the dash cam video, entering from the right and approaches the other two officers that are huddled around the front passenger side of the vehicle with Officer #1 still rummaging through the contents of the front passenger side of the vehicle;

- (07:16): Officer #1 pulls out a Tupperware container with a pink top and clear bottom and places it on top of the vehicle;

- (07:19): A fourth Officer[4] appears, entering the dash cam video from the right;

- (08:18): Officer #4 leaves the dash cam video on the right while Officer #1 is still rummaging through the contents of the front passenger area of the vehicle as Officer #2 and Officer #3 look on;

- (08:23): Officer #2 places a bag (taken from the car) on the roof of the vehicle;

- (08:27): Officer #2 and Officer #3 move around back of the vehicle with Officer #2 opening the driver side of the vehicle;

- (08:29): Officer #3 opens the back driver side of the car while Officer #4 appears on the dash cam, entering from the right;

- (08:33): Officer #2 and Officer #3 being searching their respective areas of the vehicle;

- (08:35): Officer #4 opens the back passenger side door and begins to search the vehicle also;

- (08:39): The trunk of the vehicle is popped;

- (08:43): Officer #3 and Officer #4 both move to search the trunk of the vehicle;

- (08:51): Officer #1 stops searching the front passenger side of the vehicle and leaves the dash cam on the left;

- (09:42): Officer #1 appears on the dash cam, entering on the left;

- (09:50): Officer #1 leaves the dash cam on the left; Officer #3 removes a large cylindrical container from the trunk of the vehicle;

- (10:00): Officer #3 places the cylindrical container on top of the vehicle;

- (10:08): Officer #3 goes back to searching the trunk of the vehicle;

- (10:24): The trunk of the vehicle is closed;

8

- (10:39): Officer #4 leaves the dash cam on the right. Officer #2 moves from searching the driver seat to the back-driver side seat;

- (10:49): Officer #3 begins searching the front passenger side area of the car;

- (11:05): Officer #1 enters the dash cam from the left and approaches Officer #2;

- (11:18): Officer #2, not holding a gun, leaves the dash cam on the left. The gun of Office #2 is clearly shown holstered;

- (11:23): Officer #1 picks up the Tupperware container from the top of the vehicle. Officer #2 reenters the dash cam from the left;

- (11:26): Officer #2 is seen holding a gun when he enters from the left;

- (11:27): Officer #2 leaves the dash cam on the right;

- (11:31): Officer #3 leaves the dash cam on the right;

- (11:34): Officer #1 drops the Tupperware container on top of the police vehicle's hood;

- (11:43): Officer #1 leaves the dash cam on the right and then reenters and then leaves on the left;

- (12:39): Officer #4 reenters from the right. Officer #2 and Officer #3 also reenter from the right;

- (12:44): Officer #4 leaves dash cam to the left;

- (12:49): Officer #2 opens the driver area of the vehicle;

- (13:01): Officer #2 backs off and Officer #3 walks up and pulls something from driver's car door.

- (13:14): Officer #1 reenters dash cam from the left;

- (13:24): Officer #4 reenters dash cam from the left. Officer #1 pulls paper from top of vehicle;

- (13:28): Officer #2 opens the trunk;

- (14:38): Officer #3 and Officer #4 leave the dash cam video;

- (14:46): Officer #2 throws the cylindrical plastic container back into the trunk of the vehicle;

- (15:08): Officer #1 leaves the dash cam video on the left;

- (15:27): Officer #5[5] appears on the video from the right;

- (15:30): Officer #1 reenters video from the left, while talking on his cell phone;

- (15:49): Officer #2 closes the trunk of the vehicle;

- (16:22): Officer #4 reenters video from the right;

- (16:26): Officer #4 is now holding a gun in his right hand;

- (16:54): Officer #4 leaves the video on the right;

- (16:54-17:24): Officer #4 reenters the video on the right, partially obscured by Officer #5;

- (17:24): Officer #5 leaves the video on the right;

- (19:04): Officer #2 leaves the video on the right. Officer #1 receives a cell phone call (ringer can be heard inside the vehicle);

- (19:06): Officer #1 leaves the video on the left. Officer #4 leaves the video on the right;

- (19:22): Officer #1 reenters the video on the left. Officer #1 is still on his cell phone;

- (19:58): Officer #1 leaves the video on the left;

- (20:22): Officer #1 reenters the video on the left;

- (20:31): Officer #1 leaves the video on the right;

- (21:02): Officer #1 reenters (and then leaves) the video on the right after dropping a small plastic baggy next to the container on the front hood of the police cruiser;

- (22:14): Officers #1 and #3 enter the video from the left with Officer #1 grabbing the plastic baggy from the hood of the police cruiser;

- (22:22): Officer #1 opens the plastic baggy while Officer #3 opens the plastic container;

- (22:34): Officer #1 takes a sample of the contents of the plastic container and scoops it into the plastic baggy (or smaller sample container);

- (23:36): Officers #1 and #3 exit the video on the right;

- (25:02): Plain clothes Officer[6] enters the video from the left;

- (25:04): Officer #6 leaves the video on the right;

- (25:27): Officer #6 and Officer #1 enter the video from the right;

- (25:45): Officer #1 leaves the video on the left;

- (25:50): Officers #2 and #3 enter the video on the right;

- (25:57): Officer #1 reenters the video on the left;

- (26:46): Officers #1 and #6 leave the video on the left;

- (27:17): Officers #2 and #3 take a last look at the car with #3 on the driver side and #2 on the front passenger side;

- (27:32): Officer #1 enters from the left;

- (27:47): Officer #2 takes the bag off the top of the roof of the vehicle;

- (28:11): Officer #4 enters from the right and Officer #1 leaves to the left while Officer #3 leaves to the right;

- (28:14): Officer #1 enters from the left and then leaves;

- (28:41): Officer #2 takes the bag and goes to the passenger area of the car;

12

- (28:58): Officer #2 exits the video on the left;

- (29:20): Officer #2 and Officer #3 enter the video (#2 from the left and #3 from the right).

_____

[1] Officer #1 is heavier set Caucasian with buzz haircut.

[2] Officer #2 is skinnier, browner skin black hair, slightly longer buzzcut.

[3] Officer #3 is a white Caucasian with glass and a buzz haircut.

[4] Officer #4 appears to be a medium build black man with a buzz cut haircut.

[5] Officer #5 is a blonde-haired female wearing her hair in a pony tail, wearing shades.

[6] Officer #6 is in plain clothes and has a body builder frame, is a white Caucasian and has a shaved head and is wearing sunglasses.

## IV.    <u>ARGUMENT</u>

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures". U. S. Const., Amend. IV. A traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993). In the instant case, the Government, without supporting testimony, urges that the driver of the vehicle in which Defendant was a passenger

committed a traffic violation by failing to signal a turn, "because she was within 100 feet and she moved before signaling to turn." The Government cites the case of *United States v. Watson*, 751 Fed.Appx. 592 (Mem.) (5th Cir. 2019) (unpublished) (non-precedential) in support of its position.[2]

The facts in this case, as yet to be determined by evidentiary hearing, are not the same as the facts in *Watson*. Texas Transportation Code §545.104(b) provides that "[a]n operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet *of movement* of the vehicle before the turn." (emphasis supplied). The conduct of the **WILSON** vehicle's driver, as shown by the car cam video, does not fall within the plain meaning of the Texas statute. There was not 100 feet of movement before the turn; it would have been impossible to comply with a 100 feet requirement.[3] The current vehicle was at a stop regulated by a traffic light, but in a left-hand turn lane.[4] The provisions of Texas Transportation Code §545.104(b), copy attached, by its plain language, applies only to vehicles that are *in movement* and not stopped in a marked turn lane that is controlled by a traffic light. The driver, who did signal a left turn before or as  actually turning, and the

---

[2] While a weapon was later noticed and recovered from the vehicle, such occurred well after the illegal stop and investigative questioning by the officer(s).

[3] The two cars in front of the relevant vehicle also turned without turn blinkers and moved into the far-left lane on the turn. They were not stopped.

[4] The video does not show if the vehicle's left-hand turn signal had been on before the vehicle came to a stop in the turn lane, and then had to be turned back on by the driver when the light changed; or not. The video starts with the vehicle already stopped in the turn lane for the light.

vehicle was stationary immediately prior to making the signal controlled left turn from a left-turn lane,[5] her conduct did not fall within the provisions of §545.104(b) to signal a turn within the last 100 feet of movement of the vehicle.

**WILSON** urges that to interpret §545.104(b) as being applicable to vehicles that make a lawful stop at a traffic signal at an intersection with a noted turn lane would lead to absurd results because a driver of a motor vehicle would be prohibited from making a right or left turn once his or her vehicle came to a stop at a controlled intersection if the driver had not previous to the stop signaled or his or her signal stopped when the vehicle stopped at the light stop. **WILSON** asserts that §545.104(b), by its plain language, does not prohibit an operator of a motor vehicle from deciding to make a left or right turn after coming to a complete stop at an intersection controlled by a traffic light or stop sign and in a marked turn lane, especially as such may not be a turn as much as a continuation of the very lane in which the vehicle was located. (The lane turns to the left or the right, and the vehicle likewise follows the lane).

In *United States v. Alvarado-Zarza*, 782 F.3d 246 (5th Cir. 2015), the Fifth Circuit held that under Texas law, the requirement that a driver signal a turn for at

---

[5] While it is true that the lane in which the vehicle had come to a stop indicated a left turn or an allowance for the vehicle to go straight, such suggests, contrary to the Government view, that the driver has an option and can make up the driver's mind as the vehicle progresses without violating any law or creating any danger to others.

15

least 100 feet before turn applied only to turns, not to lane changes. This case delves into one of the limitations of §545.104(b). The *Alvarado-Zarza* court found that the Police officer's legal error in initiating the traffic stop on the ground that the motorist failed to signal a lane change for at least 100 feet was not objectively reasonable, and thus the officer lacked reasonable suspicion for the stop. Another example of the limitations cases that have been applied to §545.104(b) is the case of *Trahan v. State,*16 S.W.3d 146 (Tex.App.-Beaumont 2000), which held that exiting a freeway without using a turn signal was not a statutory violation, and thus that the stop of a driver on that basis was illegal, absent any evidence that exiting the freeway required the driver to turn out of the lane or that driver's exit was unsafe.

In *State v. Griffin,* 2003 WL 21018319 (Tex.App.-San Antonio  2003) (not reported) the Court held that the involved Officer did not have reasonable suspicion to stop defendant for failure to maintain a single marked lane, for failing to signal a lane change, and for drifting onto the shoulder, where evidence was presented that defendant's vehicle never fully left its own lane of traffic, that the movements made by defendant's vehicle were not unsafe, that defendant drove on the shoulder of the road to allow the officer to pass him, and that defendant did not signal when pulling onto the shoulder which was not a lane. The trial court granted, and the Appellate Court upheld the Motion to Suppress in an intoxicated driving case.

In *Mahaffey v. State,* 316 S.W.3d 633 (Tex.Crim.App. 2010) (*See Mahaffey v. State,* 364 S.W.3d 908 (Tex.Crim.App. 2012; *Mahaffey v. State,* 2012 WL 3535844 (Tex.App.-Tyler, Aug. 15, 2012) the Court held that merging into a lane from an ending lane was neither a "turn" nor a "lane change" that required use of a turn signal, and therefore that defendant's failure to signal while moving on the roadway could not have supported a traffic stop in a driving while intoxicated (DWI) prosecution. The Court pointed out that if the road itself makes sharp switchback turns going up the mountain, the driver need not signal these "turns" because he is simply following the "direct course" of the road and of the traffic on that winding road. It is when he turns right or left out of the "direct course" of the road that he must signal his intention.[6] *Id.* at 639.

The *Mahaffey* Court in footnote 32 noted that in *State v. Dixon*, 206 S.W.3d 587 (Tex.Crim.App.2006), the Court of Criminal Appeals upheld the trial court's grant of a motion to suppress the fruits of a traffic stop when that stop was based only on a failure to signal a turn from a designated turn lane. In that case under Section 545.104, Diaz's failure to signal when turning from a designated turn lane was found not to be a traffic violation.

---

[6] Without noting its agreement, The Court of Criminal Appeals noted in dicta that, "Some courts have also held that a signal is required for a turn from a designated turn lane." *Id.* at 639.

The *Mahaffey* Court in footnote 32 also noted that in *Diaz v. State, No. 03–08–00523–CR, 2009 WL 2195427, *2–3, 2009 Tex.App. LEXIS 5694, *6 (Tex.App.-Austin July 23, 2009, no pet. h.) (not designated for publication)* that it was argued by the Austin appellate court that, "the *Dixon* court did not determine that a turn signal is unnecessary when turning from a dedicated turn lane. Rather, the issue before {the Texas Court of Criminal Appeals} was whether it was within the trial judge's discretion to decide whether to believe the arresting officer's assertion that he initiated the traffic stop for a traffic offense." *Diaz v. State*, 2009 WL 2195427, at *2, 2009 Tex.App. LEXIS 5694, at *5.[7]

Besides the ruling by the Texas Court of Criminal Appeals in *Dixon* being favorable to **WILSON**, and that ruling not being overturned by any *Mahaffey* opinion, there is also in fact a conflict within the Transportation Code that needs to be analyzed by the Court.  Texas Transportation Code § 544.004 states:

> (a)    The operator of a vehicle or streetcar shall comply with an applicable official traffic-control device placed as provided by this subtitle unless the person is:
>> (1)   otherwise directed by a traffic or police officer; or
>> (2)   operating an authorized emergency vehicle and is sub-ject to exceptions under this subtitle.
> (b)    A provision of this subtitle requiring an official traffic-control device may not be enforced against an alleged violator if at the time and place of the alleged violation the device is not in proper position and sufficiently legible to an ordinarily observant person. A provision of

---

[7] Likewise see *State v. Ballman*, 157 S.W.3d 65 (Tex. App.-Ft. Worth 2004, pet.refused) (granting motion to suppress).

this subtitle that does not require an official traffic-control device is effective regardless of whether a device is in place.[8]

In the present case there is an applicable official traffic-control device placed in the roadway that allows an official left-hand turn (or for one to go straight). The driver of the vehicle was in compliance with an applicable official traffic-control device placed in the roadway and thus the driver is in compliance with Texas Transportation Code § 544.004, copy attached.

**WILSON** thus urges that the Harris County Sheriff's Officers did not have a reasonable suspicion to believe that the driver of the vehicle had violated Texas Transportation Code §545.104(b),[9] and that the initial stop of the vehicle was an unlawful seizure conducted in violation of the Fourth Amendment prohibition of illegal seizures. *United States v. Shabazz*, 993 F. 2d 431, 434 (5th Cir. 1993); *Katz v. United States*, 389 U.S. 347, 357 (1967). For the reasons stated, the initial stop of the vehicle was not justified by a reasonable suspicion that the driver had committed a traffic violation and was thus unlawful and a violation of the Fourth Amendment's prohibition of unreasonable seizures, from its inception. *Id.*

---

[8] Indeed, Texas Transportation Code § 545.101(e) authorizes such roadway placement:  The Texas Transportation Commission or a local authority, with respect to a highway in its jurisdiction, may:
(1)  authorize the placement of an official traffic-control device in or adjacent to an intersection;

[9] No BOLO has been presented in discovery and the Sheriff's Office, upon request, has detailed that it does not have copies of the dispatch tape or dispatch notes as it only keeps same for 60 days. Therefore, without testimony, there are no exigent circumstances to this stop.

Even if the initial stop was valid, as the individuals were immediately arrested, as shown by the car cam video, the scope of the detention exceeded the purpose of the initial stop and violated the Fourth Amendment because it was not supported by a reasonable suspicion to believe that **WILSON** or the driver were involved in illegal drug smuggling. U.S.C.A. Const.Amend. 4. *Arizona v. Gant,* 556 U.S. 332, 344 (2009). The scope of a search must be reasonably related to its initial justification. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968) ("The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.").

To be reasonable, a traffic stop must be temporary and last no longer than necessary to effectuate its original purpose. *Ohio v. Robinette*, 519 U.S. 33, 50 (1996); *see also Arizona v. Johnson*, 555 U.S. 323, 334 (2009); *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). Once the reason for the traffic stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity." *Robinette*, 519 U.S. at 41 (Ginsburg, J., *concurring*)). Rather, officers must have a reasonable suspicion of criminal activity in order to continue detaining an individual. *Terry*, 392 U.S. at 19–20. Once the officer ascertained the driver's identity, she should have, even under the Government theory, have received a ticket or warning for turning without a signal and/or improper lane change, and the reason for any further detention dissipated. There was no reason at all to detain the passenger.

20

In *Arizona v. Gant*, 556 U.S. 332 (2009), the United States Supreme Court held that a warrantless automobile search incident to arrest of a recent occupant of the vehicle is proper under the Fourth Amendment to the United States Constitution only (1) when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search or (2) when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.

The search incident to arrest exception to a warrant requirement thus does not apply to this search of the driver's vehicle following the driver's and **WILSON's** arrest on a traffic stop, where both the driver and **WILSON** were handcuffed and secured in a separate patrol car before the officers even searched the driver's car and before the police dog was used; police could not reasonably have believed either that defendant could have accessed the car at the time of the search or that evidence of the offense for which he was allegedly arrested might have been found therein. U.S.C.A. Const.Amend. 4. *Arizona v. Gant,* 556 U.S. 332, 344 (2009). The Officers needed probable cause to believe the vehicle contained evidence of criminal activity in order for police to lawfully search any area of the vehicle in which the evidence might be found. *Arizona v. Gant*, 556 U.S. 332, 347 (2009); *United States v. Ross*, 456 U.S. 798, 820–821 (1982). As *Gant* has been the law for a considerable amount of time, **WILSON** urges that any alleged mistake of law by the Officers was not objectively reasonable.

Furthermore, the Government, after the arrests and detention of the driver and **WILSON,** had plenty of time to properly obtain a warrant to search the vehicle. There were then no exigent circumstances, and the circumstances were not sufficiently exigent to justify the warrantless entry. The vehicle was dully parked in the parking lot of a Burger King. *See generally United States v. Lage*, 183 F.3d 374, 380 (5th Cir.1999).

## V.    CONCLUSION

The stop, search and questioning of **WILSON** by Government agents is fatally flawed.  The Agents possessed no search or arrest warrant at the time of the stop, arrest, search or interview, and any consent to the search by his girlfriend was limited and no Miranda was given during the stop and detention of Defendant **WILSON**.  Any statements made by Defendant **WILSON** were made during an unlawful stop and detention.  As a result, the statements from the stop and detention and any evidence related to the unlawful search of the car its content, or of the body of Defendant and/or fruit therefrom should be suppressed.

Respectfully submitted,

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER, Sr.
State Bar No. 06672400
Essmyer & Daniel, P.C.
5111 Center Street
Houston, Texas 77007
(713)869-1155 Telephone
(713)869-8659 Facsimile

messmyer@essmyerdaniel.com

Attorney for Defendant
TRAVIS DEMOIS WILSON

### CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this instrument via the USDC Southern District's CM/ECF system per the Local Rules on this, the 2nd day of August 2019.

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER, Sr.